J-A16029-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF D.R.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: J.A.M., FATHER | : | |
| | : | No. 65 WDA 2026 |

Appeal from the Decree Entered December 9, 2025
In the Court of Common Pleas of Butler County Orphans' Court at No(s):
2024-00023A

| | | |
|---|---|---|
| IN THE INTEREST OF: D.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: J.A.M., FATHER | : | |
| | : | No. 66 WDA 2026 |

Appeal from the Order Entered December 22, 2025
In the Court of Common Pleas of Butler County Juvenile Division at
No(s):  CP-10-DP-0000124-2022

BEFORE:  McLAUGHLIN, J., KING, J., and BENDER, P.J.E.

MEMORANDUM BY KING, J.:                    **FILED: JULY 9, 2026**

Appellant, J.A.M. ("Father"), appeals from the decree entered in the Butler County Court of Common Pleas Orphans' Court, which granted the petition of Appellee, the Butler County Children and Youth Agency ("CYA"), for involuntary termination of Father's parental rights to his minor child, D.R.M. ("Child").  Father has also filed a separate notice of appeal from the court's

order changing Child's placement goal to adoption. We affirm.

The relevant facts and procedural history of this appeal are as follows. Child was born in December 2013. Child's natural parents are A.C.C. ("Mother") and Father. Father was absent from Child's life for approximately ten years. For a portion of that time, Father was incarcerated. As a result of his prior conviction, Father is required to register as a sex offender. (*See* N.T. Hearing, 7/17/25, at 99-100).[1]

Mother and Child resided with R.C. ("Maternal Grandmother") and Child's half-siblings. On December 5, 2022, CYA received a General Protective Services referral alleging that Mother overdosed, and Maternal Grandmother revived Mother by administering Narcan. CYA held a meeting to consider the family's circumstances on December 20, 2022. At that time, CYA determined that Mother and her paramour, J.S., were required to submit to drug screens. On December 29, 2022, CYA contacted Mother, who admitted to recent drug usage. Mother also refused a drug screen. On December 30, 2022, the court transferred legal and physical custody of Child to CYA, and it placed Child in kinship care with Maternal Grandmother. By order dated January 18, 2023, the court adjudicated Child dependent.

---

[1] At the termination hearing on April 28, 2025, CYA presented the criminal docket from Father's case, which occurred in Lawrence County. The docket revealed that Father entered a guilty plea in 2015 to indecent assault, 18 Pa.C.S.A. § 3126(a)(1). (*See* N.T. Hearing, 4/28/25, at 155; CYA's Exhibit 17).

After some initial difficulties, CYA first contacted Father in October 2023. Father attended a permanency review hearing on November 15, 2023, and he expressed a desire to be "involved" in Child's life. (Permanency Review Order, filed 11/22/23, at 2). CYA scheduled therapeutic visitation for Father, which commenced on April 11, 2024. Father subsequently made biweekly visits with Child, which resulted in moderate compliance with his permanency plan objectives.

On April 22, 2024, CYA filed petitions for the involuntary termination of Mother and Father's parental rights. CYA filed a corresponding motion to change Child's placement goal to adoption on June 26, 2024. On October 17, 2024, the dependency and termination cases were reassigned to a new jurist, and the outstanding termination petitions and goal change motion were consolidated for the court's review.[2] Termination hearings occurred over the course of four days: January 16, 2025, April 28, 2025, May 30, 2025, and July 17, 2025. Immediately before the January hearing, the court conducted an *in camera* interview with Child and her half-siblings.[3] At the subsequent

---

[2] Attorney Lope served as Child's guardian *ad litem* ("GAL") in the dependency case, as well as Child's legal counsel for the termination proceedings. In its findings of fact, the court determined that "a conflict of interest does not exist…. Child neither fully comprehends the true depth of 'permanency' nor articulate[s] a reasonable preference." (Trial Court Opinion, filed 12/9/25, at 1 n.2).

[3] The court also conducted an *in camera* meeting with Child and her half-siblings before the July 17, 2025 hearing.

hearings, CYA presented testimony from agency caseworkers, supervisors, service providers, and a psychologist. Father testified on his own behalf at the July 2025 hearing.

On December 9, 2025, the court issued findings of fact, conclusions of law, and final decrees terminating Mother and Father's parental rights. In its findings, the court emphasized Child's attachment to Maternal Grandmother, Father's extended absence from Child's life, and Father's ongoing involvement with the criminal justice system. On December 22, 2025, the court also granted CYA's goal change motion. On January 8, 2026, Father timely filed a notice of appeal and concise statement from the decree terminating his parental rights. That same day, Father filed a separate notice of appeal from the goal change order. Mother is not a party to the current appeals, which this Court consolidated *sua sponte*.

Father now raises the following issues on appeal:

> Whether the trial court committed an error of law by interviewing the child without placing the interview on the record.
>
> Whether the trial court abused its discretion in finding by clear and convincing evidence that the requirements of 23 Pa.C.S.A. § 2511(b) were met.
>
> Whether the trial court committed an abuse of discretion in finding by clear and convincing evidence that Father displayed conduct continuing for a period of at least six (6) months immediately preceding the filing of the petition for involuntary termination of parental rights which evidenced a settled purpose of relinquishing his parental claim to the child or refused or failed to perform parental duties during that time under 23 Pa.C.S.A. § 2511(a)(1), particularly

where [CYA] did not locate [F]ather or provide notice of hearings to him until October 24, 2023.

Whether the trial court erred and committed an abuse of discretion in finding by clear and convincing evidence that the conditions that led to the removal or placement of the child continue to exist, Father cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of parental rights would best serve the needs and welfare of the child under 23 Pa.C.S.A. § 2511(a)(5), particularly where [CYA] did not locate [F]ather or provide notice of hearings to him until October 24, 2023.

Whether the trial court committed an abuse of discretion in finding by clear and convincing evidence that the conditions that led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child under 23 Pa.C.S.A. § 2511(a)(8).

Whether the trial court abused its discretion in terminating Father's rights pursuant to 23 Pa.C.S.A. § 2511(a)(11).

Whether the trial court abused its discretion in changing the goal from reunification to adoption.

Whether the court's findings are against the weight of the evidence.

(Father's Brief at 10).

Appellate review in termination of parental rights cases implicates the following principles:

In cases concerning the involuntary termination of parental rights, appellate review is limited to a determination of whether the decree of the termination court is supported by competent evidence. This standard of review corresponds to the standard employed in dependency cases, and requires appellate courts to accept the findings of fact and

- 5 -

credibility determinations of the trial court if they are supported by the record, but it does not require the appellate court to accept the [trial] court's inferences or conclusions of law. That is, if the factual findings are supported, we must determine whether the trial court made an error of law or abused its discretion. An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion; we reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill will. Thus, absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. However, we must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re Adoption of C.M.*, 667 Pa. 268, 294, 255 A.3d 343, 358-59 (2021) (internal citations and quotation marks omitted).

Additionally, "[t]he trial court is free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (quoting *In re Diaz*, 669 A.2d 372, 375 (Pa.Super. 1995)).

Appellate courts reviewing such fact-bound claims arising in termination matters "should defer to the trial judges who see and hear the parties and can determine the credibility to be placed on each witness and, premised thereon, gauge the likelihood of the success of the current permanency plan; and … even if an appellate court would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the trial court."

*Interest of K.T.*, ___ Pa. ___, ___, 296 A.3d 1085, 1117 (2023) (quoting

*Interest of S.K.L.R.*, 667 Pa. 609, 633, 256 A.3d 1108, 1122 (2021)).

In his first issue, Father contends that the trial court conducted an *in camera*, off-the-record interview with Child and her half-siblings at the January 16, 2025 hearing. Father maintains: "It was never made clear by the trial court that it intended to meet with the children and have discussions with them without those interactions being recorded by a court reporter." (Father's Brief at 21). Complicating matters, Father notes that he and counsel were "engaged in substantial discussions outside the courtroom on the first day of trial," and these discussions somehow delayed Father and counsel's discovery of the off-the-record nature of the *in camera* interview. (*Id.*) Father relies on *In re Adoption of A.J.L.,* 352 A.3d 958 (Pa.Super. 2025) (unpublished memorandum), for the proposition that it was the court's duty to ensure counsel was present for the *in camera* interview. Moreover, Father asserts that he is raising this issue at the first possible opportunity because he did not learn that the *in camera* interview was not transcribed until "hearing from the court reporter while preparing the notice of appeal[.]" (*Id.*) Father concludes that the court committed reversible error by conducting the *in camera* interview without counsel or the court reporter present. For the following reasons, Father's issue is waived.

The Juvenile Act controls the disposition of dependent children. *In re R.P.*, 957 A.2d 1205, 1217 (Pa.Super. 2008). Specifically, the Juvenile Act governs permanency hearings, in relevant part, as follows:

**§ 6351.  Disposition of dependent child**

\*    \*    \*

**(e)      Permanency hearings.—**

> (1)    The court shall conduct a permanency hearing for the purpose of determining or reviewing the permanency plan of the child, the date by which the goal of permanency for the child might be achieved and whether placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child.  In any permanency hearing held with respect to the child, **the court shall consult with the child regarding the child's permanency plan, including the child's desired permanency goal, in a manner appropriate to the child's age and maturity**.    If the court does not consult personally with the child, the court shall ensure that the views of the child regarding the permanency plan have been ascertained to the fullest extent possible and communicated to the court by the guardian *ad litem* under section 6311 (relating to guardian *ad litem* for child in court proceedings) or, as appropriate to the circumstances of the case by the child's counsel, the court-appointed special advocate or other person as designated by the court.

42 Pa.C.S.A. § 6351(e)(1) (emphasis added).  If the court chooses to conduct an *in camera* interview with the child, our Rules of Juvenile Court Procedure provide: "Upon motion by any party or on the court's own motion, *in camera* proceedings are to be recorded and each party's attorney shall be present." Pa.R.J.C.P. 1134.

Instantly, the trial court conducted a combined hearing for the termination and dependency matters on January 16, 2025.  At the start of the hearing, the court took note of who was present.  One of the attorneys

affiliated with Child's half-sibling announced that Father and his counsel were "in the hallway." (*See* N.T. Hearing, 1/16/25, at 4). Before the court completed its roll call, however, it announced that "Attorney Burton is here. You're fine. Come on in." (*Id.* at 5). Thereafter, with Father's counsel present, Child and her half-siblings entered the courtroom. The GAL then stated, "Judge, the children are here. I'm assuming you wanted to put eyes on, and then maybe we discuss them." (*Id.* at 8). The court responded, "Back here?" (*Id.*) The GAL responded affirmatively. With that, the court announced a recess.

When the recess ended, the court declared that it had conducted an *in camera* meeting with the children. Regarding Child, the court commented that "she is very well-spoken[.]" (*Id.* at 8). At that point, Father's counsel did not object to her preclusion from the *in camera* interview, and she did not object to the court's failure to have the interview transcribed. Absent any objection, Father's claim is waived.[4] *See Matter of S.H.D.N.*, 343 A.3d 737,

---

[4] To the extent Father argues that there was some confusion about what occurred at the beginning of the January 16, 2025 hearing, we observe that the court conducted a second *in camera* interview with the children prior to the final termination hearing on July 17, 2025. At that time, Father and his counsel were present in the courtroom. The court stated: "I met with all three kids in chambers. I met with them also in January. … And [Child], we had good conversations with GAL Lope, basically, about what we are doing here." (N.T. Hearing, 7/17/25, at 4). Again, Father's counsel did not object to her omission from the *in camera* interview or the court's failure to have the interview transcribed. On this record, we disagree with Father's contention that he did not have an opportunity to raise this issue prior to the filing of the notice of appeal. (*See* Father's Brief at 21).

744-45 (Pa.Super. 2025) (explaining that although court did not explicitly invite mother's counsel to *in camera* interview with children, counsel did not object to omission or request to attend; accordingly, mother waived challenge to counsel's absence from interview); Pa.R.A.P. 302(a) (stating "issues not raised in the trial court are waived and cannot be raised on appeal"). Accordingly, Father is not entitled to relief on his first claim.[5]

Father's remaining issues are related, and we address them together. Father contends that the trial court improperly emphasized Father's reliance on others to care for Child throughout her life, rather than focusing on Father's efforts to be an involved parent "upon learning of [CYA's] involvement." (Father's Brief at 26). Father argues that CYA is to blame for Father's inability to reunite with Child because CYA did not facilitate visitation until April 2024. Regarding termination under Section 2511(a)(11), Father also claims that his status as a Tier I sex offender means "he is unlikely to reoffend," and "[h]e has served a significant portion of his 15-year reporting period with no further sexual offenses." (*Id.* at 32 n.10). Regarding Child's best interests, Father asserts that the court ignored evidence of a developing bond. Similarly, Father notes that a "fair summary" of the expert testimony from the termination hearing is that Child "should continue to live with the maternal grandmother

_____

[5] Although we deny relief on Father's claim, we echo the sentiments of CYA and Child's legal counsel, who caution that off-the-record, *in camera* interviews are not "best practice." (**See** Appellees' Brief at 10) (citing Pennsylvania Dependency Benchbook, 4th Edition, at Chapter 20.6.1).

(and her two siblings), but **not** that Father's parental rights be terminated."

(**Id.** at 31) (emphasis added). Based upon the foregoing, Father concludes that the court erred in terminating his parental rights and granting CYA's goal change motion. We disagree.

CYA filed a petition for the involuntary termination of Father's parental rights on the following grounds:

> ### § 2511. Grounds for involuntary termination
>
> **(a) General rule.**—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> *     *     *
>
> (11) The parent is required to register as a sexual offender under 42 Pa.C.S. Ch. 97 Subch. H (relating to registration of sexual offenders) or I (relating to continued registration of sexual offenders) or to register with a sexual offender registry in another jurisdiction or foreign country.[6]
>
> **(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

_____

[6] Indecent assault, 18 Pa.C.S.A. 3126(a)(1), is classified as a Tier I sex offense with a registration period of fifteen years. **See** 42 Pa.C.S.A. § 9799.14(b); 42 Pa.C.S.A. § 9799.15(a)(1).

23 Pa.C.S.A. § 2511(a)(11), (b) (internal footnote omitted). "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa.Super. 2010).[7]

This Court has elaborated on the requirements for termination under Section 2511(a)(11) as follows:

> As to Section 2511(a)(11), this Court has observed that the language of the statute provides that, when the parent is required to register as a sexual offender, the court may terminate the parent's rights. Of particular note, Section 2511(a)(11) does not mandate further inquiry into the parents' actions. The sole condition is that the parent is required to register as a sexual offender. Indeed, this Court has strongly suggested that litigants are "estopped" from challenging the validity of their registration status, or the underlying criminal convictions, in parental termination proceedings.

*Interest of Z.N.B*., 327 A.3d 241, 249 (Pa.Super. 2024) (internal citations and most quotation marks omitted).

If the court determines that there are grounds to terminate parental rights under Section 2511(a), the court must "engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." *In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007). "Intangibles such as love,

---

[7] CYA also sought the involuntary termination of Father's parental rights under Section 2511(a)(1), (5), and (8), but we need only analyze Section 2511(a)(11) for purposes of this appeal.

comfort, security, and stability are involved when inquiring about the needs and welfare of the child." ***In re C.P.***, 901 A.2d 516, 520 (Pa.Super. 2006). "The court must also discern the nature and status of the parent-child bond, paying close attention to the effect on the child of permanently severing the bond." ***Id.*** "In this context, the court must take into account whether a bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." ***In re Z.P., supra*** at 1121.

Additionally:

> The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care…; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability. These factors and others properly guide the court's analysis of the child's welfare and all her developmental, physical, and emotional needs. Trial courts have the discretion to place appropriate weight on each factor present in the record before making a decision regarding termination that best serves the child's specific needs.

***Interest of K.T., supra*** at ___, 296 A.3d at 1113 (internal citations and footnotes omitted).

Instantly, the court received testimony from Dr. Eric Bernstein, a licensed psychologist who conducted parental capacity and bonding evaluations on June 24, 2024. (***See*** N.T. Hearing, 4/28/25, at 12). Dr. Bernstein testified Father possessed a "limited understanding" of Child's "schooling and her overall interest and wellbeing." (***Id.*** at 15). Nevertheless,

a parental stress test "affirmed his identification as a capable father who, from his perspective, is building a relationship with [Child] … and trying to re-enter her life in the role of a caregiver." (*Id.* at 16). Despite Father's attempt to act as a caregiver, Dr. Bernstein emphasized Maternal Grandmother's role in Child's life:

> [M]y understanding is based upon the information provided that [Child] has been all but raised by her grandmother, has a strong relationship with grandmother, according to the child, not according to me, and that she lives with her siblings. That, unless there is provided evidence that in some way, that her needs, that the grandmother has been derelict, or that the information provided is incorrect, I would imagine for any child that being removed from a provider who has consistently raised them as being potentially difficult for that child.
>
> \*   \*   \*
>
> Also, I highlighted that the father's limited knowledge of the child's needs was of some concern, especially given his pursuit of trying to re-enter her life as a full-time caregiver. Unstated, but implicit, there is some concern about his overall stability. Unstated, but implicit, also, about his marijuana use on a regular basis.[8]
>
> \*   \*   \*
>
> And, of course, there is the child's preference and understanding that she feels, at least she feels supported in her grandmother's care, and conveyed the importance of that continuing.

---

[8] Father later testified that he started smoking marijuana when he eighteen years old to help with his "focus" because he has suffered from "ADHD and ADD all my life." (N.T. Hearing, 7/17/26, at 144). Father is also in the process of obtaining a medical marijuana card.

(*Id.* at 19-20).

On cross-examination, Dr. Bernstein addressed a question regarding whether CYA's delay in bringing Father into the case may have impacted Father's "knowledge" of Child:

> I don't know that it would be a conclusive factor for my side of things. Ultimately, within the first minute of speaking with [Child], I managed to obtain information about her schooling. And at that point, [Father] had enough opportunity to learn about what's important in her life, which at that age would be her education, … including even friends and things of that nature. So whether it is cut short by six or nine months, I think, still gives him adequate time to obtain the necessary information that's important for a child of her age.

(*Id.* at 26).

Regarding Child's relationship with Maternal Grandmother, CYA presented additional testimony from Donna Cosme, the placement facilitator for Family Pathways, and Randy Russell, the current caseworker. Ms. Cosme noted that she has "observed [Maternal Grandmother] working with [the children] on some schoolwork, going over paperwork when the kids come home from school, playing with them, just overall interacting, fixing them meals." (*Id.* at 144). Ms. Cosme also testified that Maternal Grandmother has kept Child up to date with all medical appointments, and Child seeks out Maternal Grandmother for sympathy and affection. (*See id.* at 144-45). Mr. Russell testified that Child previously indicated her desire to be adopted by Maternal Grandmother, but Child also mentioned that she "would like continued contact with her father." (N.T. Hearing, 5/30/25, at 47).

Mr. Russell also addressed new criminal charges that Father was facing:

> [COUNSEL:] Concern arose with [Father] around some recent criminal charges?
>
> [WITNESS:] Correct. He was charged with possession with intent to deliver in Lawrence County.
>
> [COUNSEL:] And to the best of your knowledge, those charges are still pending?
>
> [WITNESS:] Correct.

(*Id.* at 19).[9]

Additionally, CYA provided testimony from Paige McCracken, a case worker, who addressed Child's initial response to meeting Father, as well as difficulties in setting up visitation:

> [COUNSEL:] Did you have any talks with [Child] at that time as to her not recognizing him? And then she was told who that was?
>
> [WITNESS:] I did. I spoke to [Child]. … I spoke to her on a home visit on the 6th of November of 2023, just kind of preparing her that [Father] did want to be a part of her life. She wasn't really sure. She said, okay, yeah, that's fine.
>
> Well, when the November 15th hearing came around, he walked in. It was my understanding, she thought I was speaking about [Mother's current paramour] because he was intact with [Mother] at the time of the case. And when I did show her who he was, she was very upset. I think just going through some emotions. Did have some behaviors when she got home that day.

---

[9] A subsequent permanency review order noted: "The drug-related criminal charges against Father are resolved. He will not be incarcerated, but is placed on 24 months' probation. There is no documentation to confirm this outcome." (Order, filed 11/24/25, at 2).

[COUNSEL:] Was that when the referral went for the therapeutic visitation?

[WITNESS:] So [Child], with respect to [Child], we—it was kind of back and forth talking to [Father] about it, talking to [Maternal Grandmother] and [Child] about it for a bit. And I think there was a period of time that I also wasn't hearing from [Father]. And then eventually, we did put in family therapy. The 22nd of February is when we put that through to Family Pathways, of 2024.

[COUNSEL:] So there was a period of time in which [Father] expressed some interest in wanting to engage, and then a period of time in which he was a little less than engaged?

[WITNESS:] Yeah. … I did try to reach out. And it seemed as though [Father's] contact information had changed. So I believe when I did call him, he did state he tried to reach out. But I'm not sure who he reached out to between the November 15th hearing of 2023 and February 7th of 2024.

(N.T. Hearing, 4/28/25, 164-66).

At the final hearing, Father testified concerning his absence from Child's life. Father alleged that he was in communication with Mother before the termination proceedings commenced, and Mother indicated that she did not want Father involved with Child because she did not want to jeopardize Child's stability. Father also testified that Mother would thwart his attempts to contact Child:

[COUNSEL:] So you had fairly regular communication with [Mother], again, spring of 2022 through fall of 2023?

[WITNESS:] Correct.

\* \* \*

[COUNSEL:] You've talked a little bit about the difficulty

- 17 -

communicating with [Mother] about [Child] and her wanting to make sure [Child] stayed in what she termed a stable situation. Did you have some contact with [Child]?

[WITNESS:]   No.

[COUNSEL:]   [Mother] would not permit it?

[WITNESS:]   She didn't let me call her, talk to her, nothing.

[COUNSEL:]   Did you at any point take actions to try to get custody time?

[WITNESS:]   I mean, when I first got out, I was still dealing with some stuff and I was making sure that was all okay. Because the probation, my P.O. was constantly violating me on stuff. So I didn't want to go and do that and then violate and get sent back.

(N.T. Hearing, 7/17/25, at 103, 105).

The court considered this testimony and concluded that sufficient evidence supported termination of Father's parental rights:

[CYA] established by clear and convincing evidence Father is required to register as a sexual offender…. He was sentenced to imprisonment and, as a condition of the sentence, Father must register as a sexual offender under the Sexual Offender Registration and Notification Act ("SORNA"). Father points out that he is not deemed to be a lifetime reporter, and has only a few more years remaining to register, assuming there are no intervening violations. The troubling and undisputed fact is Father's victim was close to the child's current age. Father clearly is within the statutory boundary encompassing Subsection 2511(a)(11) to clearly and convincingly terminate his parental rights to his daughter.[10]

_____

[10] We reiterate Father's concession that his conviction resulted in his classification as a Tier 1 sex offender with a fifteen-year reporting requirement. (*See* N.T. Hearing, 7/17/25, at 100).

* * *

> The child's need for safety, stability, and permanency clearly outweigh any potential harm to the child from the severing any perceived emotional bond she may have with her father. The credible evidence unquestionably establishes she is emotionally well-established living in Maternal Grandmother's household with her bonded half-siblings. Overall, the evidence indicates Father lacks sufficient parenting abilities to ensure the future safety, stability, nurturing, and well-being of his daughter. Father's parenting disinterest, both prior and in the early stages of [CYA's] involvement, cannot suddenly be deemed sufficient to justify denying termination of his parental rights and responsibilities.

(Trial Court Opinion, filed 12/9/25, at 27, 29) (internal citations omitted).

Our review of the record supports the court's conclusions. CYA's evidence established Father's status a registered sex offender, which supported termination under Section 2511(a)(11). *See Interest of Z.N.B., supra*. As far as Child's best interests, the court acknowledged that "Child may suffer some incidental grief and loss with the termination of her father's parental rights, caused by suddenly being introduced to him in a therapeutic setting, only to experience a sudden halt in all contact." (Trial Court Opinion at 29). Despite these recent attempts to establish a parent-child relationship, however, the court correctly determined that CYA's evidence demonstrated that termination would not destroy a necessary and beneficial relationship for Child. *See In re Z.P., supra*. To the extent Father also complains about the court's credibility determinations in favor of CYA's witnesses, we cannot reweigh the evidence. *See Interest of K.T., supra*.

Based upon the foregoing, we cannot say that the court erred in terminating Father's parental rights. *See In re Adoption of C.M., supra*. Because we affirm the decree involuntarily terminating parental rights, we do not address Father's challenge to the goal change. *See Interest of D.R.-W.*, 227 A.3d 905, 917 (Pa.Super. 2020) (explaining goal change claim is moot when Superior Court decides to affirm trial court's termination decree). Accordingly, we affirm the decree for involuntary termination of Father's parental rights, as well as the order changing the goal to adoption.

Decree and order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 7/9/2026